IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 19-00080-01-CR-W-DGK |
| ) | |
| JEFFREY M. PERRY, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Jeffrey M. Perry's Motion to Suppress Evidence (Doc. #23). For the reasons set forth below, it is recommended that the motion be denied.

I. INTRODUCTION

On March 5, 2019, the Grand Jury returned a one-count Indictment against defendant Jeffrey M. Perry. On October 24, 2019, the Grand Jury returned a one-count Superseding Indictment against defendant Perry. The Superseding Indictment charges that on October 2, 2018, defendant Perry, knowing that he previously had been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed, in and affecting interstate commerce, firearms, to wit: a Defense Procurement/DPMS Inc., Model A-15, .223 caliber semi-automatic rifle; and a Smith and Wesson, 9mm semi-automatic pistol, each of which had been transported in interstate commerce.

On July 22, 2020, an evidentiary hearing was held on defendant Perry's motion to suppress. Defendant Perry was represented by Assistant Federal Public Defenders Jedrick Burgos and

William J. Raymond. The Government was represented by Assistant United States Attorney D. Michael Green. The Government called United States Probation Officer Laura Kline and Chief United States Probation Officer Gary Broyles as witnesses. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. United States Probation Officer Laura Kline testified that Jeffrey Perry began his supervised release term on July 12, 2016. (Tr. at 5.) Perry had been convicted of being a felon in possession of a firearm and had received a custody sentence of 36 months followed by a term of supervised release of 36 months. (Tr. at 5.) Officer Kline first met Perry on June 1, 2018, and began supervising him on June 18, 2018. (Tr. at 5, 9.) Perry had previously been supervised by United States Probation Officer Brant Bruner. (Tr. at 5.)

2. The Judgment and Commitment Order entered in defendant Perry's underlying criminal case provides, in part, the following with respect to Supervised Release:

   **STANDARD CONDITIONS OF SUPERVISION**

   * * *

   10. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

   * * *

   **ADDITIONAL CONDITIONS OF SUPERVISED RELEASE**

   * * *

   2. The defendant shall submit his person, and any property, house, residence, office, vehicle, papers, computer, other electronic communication or data storage devices or media and effects to a search at any time, conducted by a U.S.

2

> Probation Officer, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to a search may be grounds for revocation. The defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

(Tr. at 7-9; Gov. Exh. 1 at 3, 4.) Defendant Perry and Officer Bruner signed the Acknowledgment of Conditions on July 12, 2016. (Tr. at 8; Gov. Exh. 1 at 4.)

3. As Officer Kline began her supervision of defendant Perry, she learned that he lived at 2712 Benton Boulevard and visited him at that address. (Tr. at 9.) Officer Kline described the residence as a single-family, two-story, three-bedroom house that is rented to occupants by room, with common areas, like a living room and kitchen, that are shared. (Tr. at 9.) When Officer Kline began her supervision of Perry, she was informed that he had a housemate. (Tr. at 9-10.) Officer Kline testified that Perry had a bedroom, the housemate had a bedroom, and the third bedroom was unoccupied. (Tr. at 10.)

4. On August 23, 2018, Officer Kline and her partner visited defendant Perry at his residence. (Tr. at 10, 13.) The visit was just a routine visit to see if anything had changed with Perry and to check on him for compliance. (Tr. at 10-11.) Officer Kline had not called ahead to let Perry know that she was coming to visit him. (Tr. at 11.) Officer Kline testified that it was not a standard practice of the Probation Office to call ahead. (Tr. at 11.)

5. When Officer Kline arrived at 2712 Benton Boulevard, defendant Perry's vehicle was not at the residence, so Kline called Perry from outside the house. (Tr. at 11.) Perry answered the phone and Kline requested that Perry come to the front door because she was there to meet with him. (Tr. at 11.) Officer Kline testified that it took five minutes for Perry to get to the door. (Tr. at 11.) This five-minute delay concerned Officer Kline because she found it unusual for somebody to take that much time to get to the front door. (Tr. at 11.) Officer Kline asked Perry why it took him so long and he responded that he was cleaning up his room. (Tr. at 11-12.)

6. Officer Kline went inside the residence and up the stairs to the bedroom that defendant Perry rents. (Tr. at 12.) Immediately upon entering the bedroom, Officer Kline testified that she noticed a live .40-caliber round of ammunition on the floor just inside the threshold of the doorway of the bedroom. (Tr. at 12.) Officer Kline was concerned because Perry is not to have ammunition and also because the ammunition indicated that there could potentially be firearms. (Tr. at 12.) Officer Kline asked Perry to step out of the room. (Tr. at 13.) Officer Kline's partner had Perry sit down on the top stair of the staircase right outside the

3

bedroom while Officer Kline walked through the bedroom looking for other contraband in plain view. (Tr. at 13.) Officer Kline then asked for and received consent from Perry to look inside a nightstand, as well as a backpack. (Tr. at 13.) Officer Kline did not find any other contraband. (Tr. at 13.) Officer Kline testified that she did not conduct a more detailed search at that time because of safety concerns for herself and her partner. (Tr. at 34.) Officer Kline did not feel that it would be safe for just two officers to be at the residence for an extended period of time. (Tr. at 36.) Officer Kline testified that it was not office policy for an officer to conduct a full search of the premises upon the discovery of contraband during a home visit. (Tr. at 60-61.) Instead, the standard practice is for the officer to request assistance from the Probation Office Search Team which consists of probation officers who are trained to do searches. (Tr. at 14, 61.)

7. Following the August 23 visit, Officer Kline sought permission from her supervisor to conduct a search with the Probation Office Search Team. (Tr. at 13.) Officer Kline testified that her request was based on the live round of ammunition that she found at the residence, coupled with defendant Perry's criminal history of firearms convictions, as well as a recent drug test of Perry which had come back as diluted. (Tr. at 14.)

8. Chief Probation Officer Gary Broyles explained the search process as follows:

> A normal search process is the – is an officer will contact their supervisor and request to search their property based upon what they believe is reasonable suspicion. And if the supervisor approves it, then they will consult with me and go over the same facts and then I make the final determination of whether or not I believe there's reasonable suspicion to go along – to go forward with the search.

(Tr. at 70.)

9. Chief Broyles testified that he received the search request regarding defendant Perry on September 14 and approved the request on September 18. (Tr. at 70-71.) Officer Broyles provided the following explanation as to why he authorized the search:

> It was based on an accumulation of conduct and activities that she observed. She did a home visit on August 23rd and it took him an unusually long time to answer the door. He was displaying some nervous behavior. In addition, she observed an unspent live .40 round caliber round of ammunition on the floor that looked to be relatively new, like it hadn't been there for any time period. And in addition to that, his history is that he's on for felon in possession of a firearm. He has multiple prior convictions for felon in

4

>>possession of a firearm. He even had a diluted urine specimen recently as well. So, a combination of all those factors led me to believe that there was reasonable suspicion to search his residence.

(Tr. at 71-72.) Chief Broyles further testified that "[t]he reasonable suspicion I had was to search his personal effects, property, his room, which would include his cell phone." (Tr. at 93.)

10. The search of 2712 Benton Boulevard took place on October 2, 2018. (Tr. at 14, 72.) Officer Kline explained the delay as follows:

> It was simply logistics of getting a Search Team together following approval from the Chief Probation Officer, regarding schedules of team members. It was just logistically the earliest time that we could do it.

(Tr. at 14.)

11. Chief Broyles explained how a search is typically handled as follows:

> The search coordinator puts together a team of officers that are trained to execute searches. Generally, I attend most searches and act as the policy advisor in case questions come up during the search. There is someone there that's there to do evidence recovery. Essentially, we contact the offender. We always make unforced entry and secure the residence and make sure there's – everything is done safely, and then we search the residence, any place the person has access to, to see if there's any contraband or if they have violated their supervised release.

(Tr. at 72.)

12. On October 2, 2018, at approximately 1:35 p.m., Officer Kline and Senior Probation Officer Tony Wheatley arrived at defendant Perry's residence. (Tr. at 15, 72.) The plan was that once Officers Kline and Wheatley made contact with Perry, the Search Team would arrive on scene to clear the residence and execute the search condition. (Tr. at 15, 72-73.) Upon arrival, Officer Kline observed Perry and an unknown male in the front yard of 2712 Benton Boulevard working on a vehicle. (Tr. at 16.) Officer Kline testified that as she exited her vehicle, she attempted to make contact with Perry, but he ran toward his residence. (Tr. at 16.) Officer Kline shouted for Perry to stop. (Tr. at 16-17.) Perry did not obey the command. (Tr. at 17.) Perry reached his front door, went inside, and shut the door behind him. (Tr. at 17.) From the front porch, Officer Kline looked through a panel with opaque glass on the side of the door. (Tr. at 17-18.) Officer Kline

5

testified that while she could not completely see through the opaque glass, she could see light and shadows. (Tr. at 17.) After waiting for approximately one minute, Officer Kline saw movement coming down the stairs and Perry opened the door. (Tr. at 17-18.)

13. Officer Kline asked defendant Perry why he ran. (Tr. at 18.) Perry advised that there was a female inside the residence and that he wanted to make sure that she was clothed prior to Officer Kline entering the residence. (Tr. at 18-19.) Officer Kline questioned this explanation and Perry admitted that there was no one inside the residence. (Tr. at 19.) Perry then stated that he ran inside to flush some marijuana down the toilet. (Tr. at 19.) Officer Kline testified that possession of even a small amount of marijuana would be a violation of Perry's conditions of supervised release. (Tr. at 19.) Perry told Officer Kline that he was nervous based on the unannounced visit. (Tr. at 19.) Officer Kline testified that Perry appeared anxious or nervous based on the facts that he did not appear able to stand still, he had an increased rate of speech, and he had a heightened volume to his speech. (Tr. at 19.)

14. Members of the Search Team, including Chief Broyles, Supervisor Brian Graham, Supervisor Timothy Boydston, Senior Probation Officer Kurt Habiger, Probation Officer Drew Brown, Probation Officer David Gunter, Senior Probation Officer Dan Schroeder, and Senior Probation Officer Brad Cox, then arrived at the residence and went inside. (Tr. at 19-21, 74.) The Search Team did a security sweep of the residence. (Tr. at 74.) Officers Kline and Wheatley stayed in the front foyer area with defendant Perry. (Tr. at 21.)

15. At some point, officers requested that Officer Kline come up to defendant Perry's bedroom to look at a photo of a rifle, believed to be an AR-15, that was found on Perry's cell phone. (Tr. at 21-22.) Officer Kline and Chief Broyles each testified that the rifle appeared to be on Perry's bed, as indicated by the headboard and the blanket in the photo, which matched the headboard and blanket in Perry's bedroom on that date. (Tr. at 22, 76.) The photo was time-stamped October 1, 2018. (Tr. at 22, 76; Gov. Exh. 15 at 3.) Officer Kline testified that it is standard practice to search a cell phone found on scene during the course of a search based on reasonable suspicion as electronics are included in the conditions of supervision as things a probation officer may search. (Tr. at 29-30, 55.) Officer Kline testified that when a probation officer asks for and receives search authority over a supervised releasee, as she did with Perry, the officer has authority to search all the places listed in Paragraph 2 of the Additional Conditions of Supervised Release. (Tr. at 61; Gov. Exh. 1 at 4.)

16. Officer Kline testified that while defendant Perry was under supervision, she was not aware of him using his cell phone for anything illegal. (Tr. at 31.) Officer Kline further testified that she had no indication that Perry's phone was contraband.

6

(Tr. at 51.) However, Officer Kline testified that in her experience as a probation officer, she has found evidence of illegal acts on the cell phones of other supervised releasees. (Tr. at 62.)

17. Officer Kline called the landlord of the house to verify which room was rented by Perry, to determine how many occupants were renting the residence, and to determine if there was a third bedroom which was unrented, unoccupied, unsecured, and accessible to all occupants of the house. (Tr. at 22, 78.) The landlord confirmed that no one was renting the third bedroom, that it was not occupied by any tenant, and that it was unsecured and accessible. (Tr. at 22.) Officer Kline testified that she deemed the third bedroom to be a common area. (Tr. at 38.) The officers did not seek permission from anyone to search the third bedroom. (Tr. at 38.)

18. The third bedroom was searched. (Tr. at 38-39, 78.) Chief Broyles testified that he lifted the mattress on the bed and located a .40-caliber semiautomatic handgun under the mattress. (Tr. at 80; Gov. Exh. 8.) The magazine was loaded with several rounds and there was one round in the chamber. (Tr. at 82.) Underneath the same bed, Chief Broyles found a backpack which contained a .9mm semiautomatic weapon. (Tr. at 82; Gov. Exhs. 5, 7.) The magazine was loaded with several rounds, with one round in the chamber as well. (Tr. at 83.) Chief Broyles lifted the cushions of a loveseat in the bedroom and located a semiautomatic rifle. (Tr. at 83-84; Gov. Exhs. 12, 13.) The magazine was loaded with several rounds of ammunition and a round in the chamber. (Tr. at 85; Gov. Exh. 14.) Chief Broyles testified that the semiautomatic rifle found in the third bedroom resembled the rifle in the photo found on defendant Perry's cell phone. (Tr. at 87.)

19. A cell phone, a tablet, two handguns, and an AR-15 rifle were seized from the residence. (Tr. at 22-23, 85.)

### III. DISCUSSION

Defendant Perry seeks to suppress "all evidence seized from a search of his residence at 2712 S. Benton, [Kansas City,] MO on October 2, 2018." (Motion to Suppress Evidence at 1; Doc. #23.) Defendant Perry argues that Probation Officer Laura L. Kline did not have a reasonable suspicion of contraband or evidence of a violation of a condition of release to justify a search of his residence, that he had a reasonable expectation of privacy in the common areas within the residence, and that officers lacked reasonable suspicion to seize and search his cell phone.

7

A. Reasonable Suspicion

Defendant Perry signed the following Acknowledgment of Conditions when he began his supervised release term:

> The defendant shall submit his person, and any property, house, residence, office, vehicle, papers, computer, other electronic communication or data storage devices or media and effects to a search at any time, conducted by a U.S. Probation Officer, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. . . .

(Fact No. 2.)

In support of his Motion to Suppress Evidence, defendant Perry states:

> Because Mr. Perry was on supervised release, the warrantless search of his home may be upheld *only* if supported by reasonable suspicion that he was involved in unlawful conduct or a violation of his supervised release. *See United States v. Knights*, 534 U.S. 112, 121 (2001) (search of probationer's home must be supported by reasonable suspicion).

(Doc. #23 at 4.) While defendant Perry concedes that the search conducted by Officer Kline on August 23, 2018, was supported by reasonable suspicion of contraband, the defendant argues that the search conducted on October 2, 2018, was not supported by reasonable suspicion. (*Id.* at 4-5.)

In *United States v. Hamilton*, 591 F.3d 1017 (8th Cir.), *cert. denied*, 562 U.S. 909 (2010), the court provided the following guidance as to whether reasonable suspicion exists for purposes of a warrantless search by probation officers:

> Reasonable suspicion exists when, considering the totality of the circumstances known to the officer at the time, the officer has a particularized and objective basis for suspecting wrongdoing. *See United States v. Henry*, 429 F.3d 603, 609-10 (6th Cir. 2005) (utilizing the "reasonable suspicion" test for a *Terry*[1] stop as articulated by the Supreme Court in *United States v. Cortez*, 449 U.S. 411, 417-18 (1981) in assessing whether parole officers had reasonable suspicion to

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

meet the *Griffin*[2] inquiry); *United States v. Baker*, 221 F.3d 438, 444 (3d Cir. 2000) (same). . . .

> Hamilton argues that we must assess reasonable suspicion as of the time the decision to search was made—when Parole Officer Harvey initially decided to send parole officers to perform a parole search of Hamilton's home based only on the knowledge that he owned a computer and had access to the internet, which were not prohibited by his parole conditions. But the Fourth Amendment applies to the act of searching, not the initial decision to search, and it applies an objective standard based on the information known by the searching officers at the time of the search. *See Terry*, 392 U.S. at 21-22 ("And in making [the Fourth Amendment] assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer *at the moment of the seizure or the search* 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" (emphasis added)); *see also United States v. Atlas*, 94 F.3d 447, 450 (8th Cir. 1996) ("In analyzing whether a reasonable suspicion existed, the totality of the circumstances—the whole picture—must be taken into account. We must consider the information available to the police at the time of the search." (internal citations and marks omitted)). We reject Hamilton's argument that we may look only at the facts known to Officer Harvey when she decided to send Officers Parker and Tucker to make a home visit to a parolee, and we proceed to determine whether the parole officers violated Hamilton's rights under the Fourth Amendment based on the officers' knowledge at the scene of the search.

591 F.3d at 1022-23.

The Court finds that Officer Kline had a reasonable, articulable suspicion that defendant Perry was involved in unlawful conduct or violating conditions of his supervised release when she requested and received authorization to conduct a search. First, when Officer Kline went to defendant Perry's residency on August 23, 2018, it took Perry an unusually long time to answer the door which Officer Kline found concerning. (Fact Nos. 5, 9.) Next, Officer Kline observed a live 40-caliber round of ammunition on the floor of Perry's bedroom which further concerned

---

[2] *Griffin v. Wisconsin*, 483 U.S. 868, 873-74 (1987) (holding that a state regulation allowing warrantless searches of a probationer's home upon reasonable suspicion of a probation violation was reasonable under the special needs exception to the warrant and probable cause requirements of the Fourth Amendment).

9

her because Perry was not to have ammunition and also because the ammunition indicated that there could potentially be firearms in the residence. (Fact. Nos. 6, 7, 9.) Officer Kline knew that Perry had a history of firearms convictions. (Fact Nos. 7, 9.) Finally, Officer Kline was aware that Perry had recently provided a diluted urine specimen for drug testing. (Fact Nos. 7, 9.)

After Officer Kline arrived at defendant Perry's residence on October 2, 2018, but prior to the execution of the search, defendant Perry engaged in behavior that provided Officer Kline with even more reason to believe that Perry was involved in unlawful conduct or violating conditions of his supervised release. Defendant Perry ran inside his residence upon Officer Kline's arrival, ignoring her commands to stop. (Fact No. 12.) Flight is an act of evasion and is suggestive of wrongdoing. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). When asked why he ran, Perry lied to Officer Kline, giving one explanation and then changing it to another when questioned further. (Fact No. 13.) The second explanation given by Perry was that he ran inside to flush some marijuana down the toilet (possession of even a small amount of marijuana constitutes a violation of Perry's conditions of supervised release). (Fact No. 13.) Finally, Officer Kline found Perry to be displaying anxious or nervous behavior. (Fact No. 13.)

The Acknowledgment of Conditions signed by defendant Perry provides that Perry submitted his house or residence to a search conducted by probation officers based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. (Fact No. 2.) Based on the Court's finding that Officer Kline had a reasonable, articulable suspicion that defendant Perry was involved in unlawful conduct or violating conditions of his supervised release prior to requesting authorization for the search, which suspicion was increased by defendant

10

Perry's actions immediately prior to the execution of the search, the Court finds that the search of the residence conducted by the Probation Office Search Team was proper.

B. Search of Common Areas Within Residence

Defendant Perry argues that he had a reasonable expectation of privacy in common areas within the residence. (Motion to Suppress Evidence at 6-10; Doc. #23.) Given the Court's finding that Officer Kline had a reasonable, articulable suspicion that defendant Perry was involved in unlawful conduct or violating conditions of his supervised release and, thus, the Probation Office Search Team was justified in conducting a search of Perry's residence, a search of any common areas within that residence is clearly permissible.

C. Search of Cell Phone

Defendant Perry argues that officers lacked reasonable suspicion to seize and search his cell phone because he was not on supervised release for any crime that involved a cell phone and because there was nothing in his history to suggest that he used his cell phone for breaking the law or violating his release conditions. (Motion to Suppress Evidence at 13; Doc. #23.) Contrary to defendant Perry's argument, the condition to which Perry agreed, that is to "submit his person, and any property, house, residence, office, vehicle, papers, computer, other electronic communication or data storage devices or media and effects to a search . . . based upon reasonable suspicion of contraband or evidence of a violation of a condition of release"[3] was not limited to a search of only those places or objects that Perry had previously used for criminal conduct.

Defendant Perry cites the case of *Riley v. California*, 573 U.S. 373 (2014), for the proposition that the search of a cell phone should be treated differently than a search of other items.

---

[3](Fact No. 2.)

11

Case 4:19-cr-00080-DGK   Document 56   Filed 09/09/20   Page 11 of 14

(Motion to Suppress Evidence at 10; Doc. #23.) However, in *United States v. Collier*, 932 F.3d 1067 (8th Cir. 2019), the court dismissed the defendant's argument that the *Riley* decision forbade the warrantless search of the defendant's cell phone by his probation officer. The court stated:

> Collier argues the Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014), forbade the warrantless search of his cell phone at the time of his arrest. Although *Riley* held that police officers must generally obtain a warrant before searching a cell phone seized incident to arrest, *see id.* at 386, this court has recognized "*Riley* addressed privacy interests of an arrestee, not the circumscribed interests of an offender serving a term of supervised release." *United States v. Jackson*, 866 F.3d 982, 985-86 (8th Cir. 2017). This court has said "supervised release . . . involves 'the most circumscribed expectations of privacy.'" *Id.* at 985 (quoting *United States v. Makeeff*, 820 F.3d 995, 1001 (8th Cir. 2016)). Searches of a person on supervised release further "substantial interests in preventing recidivism and facilitating an offender's reentry into the community." *Id.*
>
> On the night of the search, Agent Welle requested an arrest warrant after failing to find Collier at the location where he was supposed to be and called the Moorhead police to arrest him. Additionally, Agent Welle testified he searched the phone to verify Collier's whereabouts that evening and he conducted the search on his own volition.
>
> We hold Agent Welle's search was reasonable under these circumstances, where Collier was on restrictive supervised release and suspected of engaging in illicit activities. . . .

*Collier*, 932 F.3d at 1073-74.

Defendant Perry further argues that *United States v. Lara*, 815 F.3d 605 (9th Cir. 2016), a case where a warrantless search of a defendant's cell phone by probation officers was found unreasonable under the Fourth Amendment, supports his argument for suppression. However, the *Lara* case involved conditions of probation which required the defendant to "submit his 'person and property, including any residence, premises, container or vehicle' to search and seizure 'without a warrant, probable cause, or reasonable suspicion.'" *Id.* at 607. The *Lara* court found that the terms "container" and "property" did not clearly or unambiguously encompass a cell

12

Case 4:19-cr-00080-DGK   Document 56   Filed 09/09/20   Page 12 of 14

phone. *Id.* at 610. Thus, the defendant's privacy interest in his cell phone "was not diminished or waived because he accepted as a condition of his probation a clear and unequivocal search provision authorizing cell phone search (he did not)." *Id.* at 612. The *Lara* court also noted that the terms of probation, which included suspicionless searches, had a bearing on the reasonableness of the search. *Id.* at 609. In contrast to the *Lara* case, defendant Perry's conditions reference the term "other electronic communication or data storage devices" which clearly encompasses a cell phone. Further, defendant Perry's conditions require reasonable suspicion of contraband or evidence of a violation of a condition of release before a search is authorized. Given these significant differences, the *Lara* case has limited relevance to the case before this Court.

The condition to which defendant Perry agreed provided notice that he had a reduced expectation of privacy in his cell phone while on supervised release. *See United States v. Collier*, 932 F.3d 1067, 1073-74 (8th Cir. 2019). Given the Court's finding that Officer Kline had a reasonable, articulable suspicion that defendant Perry was involved in unlawful conduct or violating conditions of his supervised release, the Court finds that the search of Perry's cell phone, just like the search of his residence, was proper.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Perry's Motion to Suppress Evidence (Doc. #23).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted

13

by the district judge, except on the grounds of plain error or manifest injustice.

          */s/ Lajuana M. Counts*
          Lajuana M. Counts
          United States Magistrate Judge